UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SYNTHIA CHINA BLAST,

                Plaintiff

                                              THIRD AMENDED
                                              COMPLAINT

                Vs.                                  03-cv-515Sr

NEW YORK STATE DEPARTMENT OF CORRECTIONAL
SERVICES, NEW YORK STATE OFFICE OF MENTAL
HEALTH, GLENN S. GOORD, BRIAN FISCHER,
LESTER N. WRIGHT, MD, JAMES T. CONWAY,
JOSE DE PERIO, MD, ROBERT TAKOS, MD,
ROBERT KIRKPATRICK, JACQUELINE LEVITT, MD,
SUSAN POST, DAVID T. PRIVETT, PAT WARREN,
and CHRISTOPHER DEAKIN, MD,

                                Defendant

1.      This is a complaint for damages and injunctive relief pursuant to 42 U.S.C. § 1983.

Pendent state law claims are raised under the New York Human Rights Law, Executive

Law § 190, et seq.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343; jurisdiction

over Plaintiff's state law claims is conferred by 28 U.S. C. § 1367.

3.      Venue is properly laid in the Western District of New York pursuant to 28 U.S.C. §

1391(b) because (1) on information and belief, at least one of the defendants resides in

this district and all of the defendants reside in New York; (2) a substantial part of the

events or omissions giving rise to the claim arose in the Western District of New York.

**PARTIES**

4.      Plaintiff, SYNTHIA CHINA BLAST, is an inmate, who, at all times relevant to this

action has been incarcerated in the custody of the NEW YORK STATE DEPARTMENT

OF CORRECTIONAL SERVICES.

5.      Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES,

("DOCS") is responsible for the confinement and habilitation of approximately 63,500

inmates held at 69 state correctional facilities plus the 850-bed Willard Drug Treatment

Campus and is guided by the Departmental Mission.

6.      Defendant NEW YORK STATE OFFICE OF MENTAL HEALTH ("OMH") operates

psychiatric centers across the State of New York, and also regulates, certifies and

oversees more than 2,500 programs, which are operated by local governments and

nonprofit agencies.

7.      Defendant GLENN S. GOORD is the former Commissioner of DOCS.  He is sued in his

personal and official capacities.

8.      Defendant BRIAN FISCHER is, the Commissioner of DOCS.  He is sued in his personal

and official capacities.

9.      Defendant LESTER N. WRIGHT is, and has been at all times relevant to this action, the

Deputy Commissioner and Chief Medical Officer of DOCS.  He is sued in his personal

and official capacities.

10.      Defendant JAMES T. CONWAY was, at all times relevant to this action, the

Superintendent of Attica Correctional Facility ("Attica").  He is sued in his personal and

2

official capacities.

11.     Defendant JOSE DePERIO, MD was, at all times relevant to this action, the Facility

Health Services Director of Attica.   He is sued in his personal and official capacities.

12.     Defendant ROBERT TAKOS, MD was, at all times relevant to this action, a physician

employed at Attica.   He is sued in his personal and official capacities.

13.     Defendant ROBERT KIRKPATRICK is, and at all times relevant to this action has been

the Superintendent of Wende Correctional Facility ("Wende").  He is sued in his personal

and official capacities.

14.     Defendant SUSAN POST is, and at all times relevant to this action has been the Deputy

Superintendent for Health Services at Wende Correctional Facility ("Wende"), and, as

such responsible for overseeing the medical unit at Wende.. She is sued in her personal

and official capacities.

15.     Defendant JACQUELINE LEVITT,  MD is, and at all times relevant to this action has

been, the Facility Health Services Director of Wende.  She is sued in her personal and

official capacities.

16.     Defendant DAVID T. PRIVETT is, and at all times relevant to this action has been, the

Unit Chief of the OMH Satellite Unit at Wende.  He is sued in his personal and official

capacities.

17.     Defendant CHRISTOPHER DEAKIN, MD, is and at all times relevant to this action has

been, employed by Defendant OMH in the OMH Satellite Unit at Wende.  He is sued in

his personal and official capacities.

18.     Defendant PAT WARREN is and at all times relevant to this action has been, employed

by Defendant OMH in the OMH Satellite Unit at Wende.  He is sued in his personal and official capacities.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.     Plaintiff has exhausted administrative remedies as required by 42 U.S.C. § 1997e by filing grievances concerning the claims asserted herein at both Attica and Wende, and pursuing those grievances through the administrative appeals process to the Central Office Review Committee.

20.     The grievances filed by the Plaintiff concerning the facts at issue herein include: A-43905-02, A-44242-02, A-44642-02, WDE 22725-05, WDE 22858-25, WDE 23897-05, WDE-23909-05, WDE 24173-06 WDE 24452-06, WEN 25600-06.

21.     In addition to filing grievances, Plaintiff has written numerous letters to the Facility Health Services Director, the OMH Unit Chief, the Deputy Superintendent for Health Services at Wende, and the Deputy Commissioner and Chief Medical Officer of DOCS in an effort to resolve medical and mental health issues that have not been resolved through the grievance process.

## FACTUAL ALLEGATIONS

22.     Plaintiff was received into DOCS custody on January 16, 1997.

23.     Plaintiff suffers from gender identity disorder, as the term is defined in the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition ("DSM-IV").

24.     Specifically, Plaintiff is a transsexual as the term is defined in the International

Classification of Diseases - 10 ("ICD-10").

25.   Although Plaintiff was born with male genitalia, Plaintiff strongly identifies as female and desires to live as a woman.

26.   Plaintiff has strongly identified as a woman and has desired to live as a woman from the time she was a teenager.

27.   Prior to her incarceration Plaintiff obtained feminizing hormones outside of licensed medical pathways, and dressed and lived as a woman.

28.   Plaintiff was not formally diagnosed as transgendered or transsexual by a licensed medical professional prior to her incarceration.

29.   Upon reception into DOCS custody, Plaintiff was identified as a male by DOCS, and she has been incarcerated in male facilities since 1997.

30.   In June 1999, Plaintiff was incarcerated at Elmira Correctional Facility.

31.   While Plaintiff was incarcerated at Elmira, in response to her requests for hormone therapy, she was evaluated and prescribed hormonal therapy at a starting dose of 0.625 mg estrogen per day.

32.   Plaintiff was transferred to Attica on February 24, 2000.

33.   Plaintiff remained on hormonal therapy at Attica.

34.   Between February 24, 2000 and June 28, 2000, Plaintiff requested increases in her estrogen dosage and also requested treatment of spironolactone to increase her breast size.

35.   Defendants refused to increase the estrogen dose, refused to prescribe spironolactone, and discontinued hormonal treatment on June 28, 2000.

36.   Defendant TAKOS advised Plaintiff that he (TAKOS) did not wish to treat Plaintiff for

transexualism.

37.   On November 15, 2000, in response to Plaintiff's persistent requests, Defendant TAKOS

reinstated Plaintiff's estrogen therapy at the 0.625 mg/day dose.

38.   Plaintiff requested increased doses of estrogen on March 8, 2001 and June 21, 2002.

39.   Defendants TAKOS and DePERIO refused Plaintiff's requests.

40.   On June 28, 2002, Plaintiff requested a consultation with a gender dysphoria specialist.

41.   Defendants DePERIO and TAKOS denied Plaintiff's request.

42.   On July 11, 2002, Plaintiff was interviewed by Dr. Kozvasznay, an OMH employee, at

Attica, who diagnosed Plaintiff as suffering from gender identity disorder, personality

disorder and eating disorder.

43.   Dr. Kozvasznay recommended that OMH staff work with medical staff to adjust

Plaintiff's hormones and consider anti-androgens.

44.   Plaintiff wrote several times to Defendant DePERIO asking him to implement Dr.

Kozvasznay's recommendations.

45.   Defendants DePERIO and TAKOS denied Plaintiff's request, citing Health Service

Policy 1.31.

46.   Plaintiff did not receive any psychological or other mental health treatment for her

transexualism while she was incarcerated at Attica.

47.   Plaintiff was permitted to wear female clothing while she was incarcerated at Attica.

48.   On information and belief, neither Defendant TAKOS nor DePERIO is knowledgeable

about the care and treatment of patients with transexualism.

49.   Between July 2002 and October 2003, Plaintiff made numerous requests to Defendant

DePERIO for increases of her hormone dosages and castration.

50. Defendant DePERIO denied all of Plaintiff's requests.

51. In June and August 2002 Plaintiff wrote to Defendants GOORD and WRIGHT seeking medical and psychological treatment for her transexualism.

52. Defendant WRIGHT responded to Plaintiff's letters to himself and Defendant GOORD, denying Plaintiff's request for any medical treatment beyond that which Plaintiff was receiving at Attica.

53. Plaintiff became increasingly distraught, agitated, and depressed by her inability to obtain adequate care for her transexualism.

54. On March 11, 2003, Plaintiff attempted self-castration.

55. Plaintiff believes she made the attempt as a result of severe mental decompensation.

56. On or about April 20, 2004, Plaintiff was transferred to Wende.

57. Plaintiff continued to receive 0.625 mg/day of estrogen at Wende, despite her repeated requests for increase doses of hormones, and sprinolactone therapy.

58. Plaintiff did not receive any psychological or other mental health treatment for her transexualism at Wende.

59. Defendants WARREN, and DEAKIN offered only to assist Plaintiff with "coping skills," which Plaintiff understood to mean skills to cope with DOCS' refusal to provide medical care.

60. In early 2005, Plaintiff was interviewed by Caillean McMahon Tronetti, DO, a forensic psychiatrist, who opined that Plaintiff's request for a change in medical treatment was "in accordance with accepted standards for pharmacological therapy for GID patients."

7

61. Dr. Tronetti recommended an oral synthetic estrogen such as estradiol combined with aldactone, a diuretic with strong anti-androgen properties.

*62.* Copies of Dr. Tronetti's report were provided to Defendants through counsel.

63. In July 2005, Defendants sought a consultation from Dr. Ravi Sinha, an endocrinologist.

64. Dr. Sinha endorsed Dr. Tronetti's recommendation.

65. Plaintiff was started on estradiol (estrogen) 2 mg twice per day, and aldactone 200 mg, twice per day by Defendant LEVITT pursuant to Dr. Sinha's recommendation.

66. Plaintiff responded well to the treatment, experiencing both physical and psychological improvement.

67. On information and belief, Defendant LEVITT is not knowledgeable about the care and treatment of patients with transexualism.

68. In August 2005, Defendant LEVITT sought a second expert consultation from a second outside consultant.

69. On or about October 4, 2005, before the second consultation had taken place, Defendant LEVITT, unilaterally, and without any medical justification, reduced Plaintiff's dosage of aldactone to 25 mg twice per day.

70. The reduction in dosage had immediate and noticeable adverse effects on plaintiff, physiologically, emotionally and mentally.

71. Plaintiff was reinstated to the doses of estradiol (estrogen) 2 mg twice per day, and aldactone 200 mg, per day on or about November 17, 2005.

72. Plaintiff has remained on the medical regimen described in the preceding paragraph from November 17, 2005 to the present, with one brief interruption during the summer of

8

2006.

73.   Plaintiff has been denied permission to wear female clothing by Defendants LEVITT,

POST and KIRKPATRICK.

74.   Defendant DEAKIN has refused to treat Plaintiff's gender identity disorder.

75.   Defendant PRIVETT has advised Plaintiff that no member of his staff is qualified to treat

Plaintiff's gender identity disorder.

76.   Plaintiff was evaluated by Dr. Matthew Leinung, a second endocrinologist selected by

DOCS on May 15, 2007.

77.   Dr. Leinung recommended that Plaintiff continue on the medical therapy of estradiol

(estrogen) 2 mg twice per day, and aldactone 200 mg, per day on or about November 17,

2005.

78.   Dr. Leinung also recommended surgical treatment, medical treatment and socio-cultural

treatment, as is set forth in his Report of May 30, 2007, which is Sealed Document No.

111 in this action.

79.   The standards of care for transsexuals have been articulated by the World Professional

Association for Transgender Health ("WPATH"), formerly the Harry Benjamin

International Gender Dysphoria Association.

80.   The WPATH Standards of Care, 6th Version (2001), Ex. A call for an holistic treatment of

gender identity disorders that includes real-life experience in the desired role, medication,

psychological treatment, socio-cultural support and intervention, and surgery, depending

on the individual needs of the patient.

81.   Defendants have failed to provide Plaintiff with a care plan for her transsexualism.

82.     Defendants have failed to provide psychological and socio-cultural treatment and support to Plaintiff.

83.     Defendants have refused to permit Plaintiff real-life experience in the desired role by specifically and repeatedly denying her requests for permission to possess and wear female clothing, and denying her request to be addressed and referred to by feminine pronouns, despite the recommendation of their own chosen specialist, Dr. Leinung.

84.     Defendants have refused to provide Plaintiff with medication to retard beard growth, despite the recommendation of their own chosen specialist, Dr. Leinung.

85.     Defendants have continued to refuse to permit Plaintiff real-life experience in the desired role, despite the recommendation of their own chosen specialist, Dr. Leinung.

86.     Defendant DOCS can provide Plaintiff real-life experience in the desired role in at least one DOCS housing unit that is specifically structured to provide safe custody for inmates, the Assessment and Program Preparation Unit at Clinton Correctional Facility.

87.     Defendant OMH can provide Plaintiff with adequate psychological and social-cultural support by providing treatment by licensed professionals who are trained, and who receive continuing education in the treatment of gender identity disorders.

88.     Defendants can provide care and treatment to Plaintiff without compromising penological goals.


**FIRST CAUSE OF ACTION:  DENIAL OF RIGHT TO BE FREE FROM CRUEL &
UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT**

89.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 - 88 as though

10

fully set forth herein.

90.  Plaintiff's gender identity disorder is a serious medical need.

91.  Plaintiff's serious medical need can only be adequately addressed by holistic treatment of

her gender identity disorders that includes some or all of the following:  real-life

experience in the desired role, medication, psychological treatment, socio-cultural support

and intervention, and surgery.

92.  The appropriate treatment of Plaintiff's serious medical need can only be determined by

qualified professionals, including physicians and mental health professionals.

93.  Defendant's refusal to provide treatment for Plaintiff's serious medical need constitutes

deliberate indifference in violation of the Eighth Amendment to the Constitution of the

United States.

94.  As a result of Defendant's violation of Plaintiff's rights, Plaintiff has suffered physical

pain and suffering, physical harm, and mental and emotional anguish.

**SECOND CAUSE OF ACTION:  DISCRIMINATION ON THE BASIS OF DISABILITY
IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**

95.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 - 94 as though

fully set forth herein.

96.  Defendant DOCS' penal facilities are "public accommodations" within the meaning of

the Human Rights Law.

97.  Gender identity disorder and transexualism are disabilities within the meaning of the New

York State Human Rights Law.

98.  Plaintiff requested reasonable accommodation for her disability in the form of permission

to possess all clothing items permitted to female prisoners and the use of female pronouns by prison staff when addressing and referring to her.

99.     Defendants' refusal to provide adequate treatment for Plaintiff's gender identity disorder violates her right to be free from discrimination on the basis of her disability under the New York State Human Rights Law.

100.    As a result of Defendants' violation of Plaintiff's rights, Plaintiff has suffered physical pain and suffering, physical harm, and mental and emotional anguish.

**THIRD CAUSE OF ACTION:  DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**

101.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 - 100 as though fully set forth herein.

102.    Defendant DOCS' penal facilities are "public accommodations" within the meaning of the Human Rights Law.

103.    Defendants have refused to provide adequate treatment for Plaintiff's gender identity disorder.

104.    Such refusal is "because of" Plaintiff's sex.

105.    Defendants' refusal to provide adequate treatment for Plaintiff's gender identity disorder violates her right to be free from discrimination on the basis of her sex under the New York State Human Rights Law.

106.    As a result of Defendants' violation of Plaintiff's rights, Plaintiff has suffered physical pain and suffering, physical harm, and mental and emotional anguish.

WHEREFORE, Plaintiff respectfully requests this Court to enter an Order:

1.      Enjoining Defendants from continuing to refuse to provide treatment for Plaintiff's

serious medical needs; and

2.      Requiring Defendants to provide treatment to Plaintiff including, but not limited to

      a.      medical care, including, but not limited to continuation of the current medical

           regimen, and

      b.      psychological care, and

      c.      surgical treatment as needed upon competent and thorough examination by a

           qualified psycho-medical treatment team; and

3.      Requiring Defendants to provide Plaintiff the socio-cultural support necessary to permit

her a real-life experience in the desired role insofar as the same does not conflict with

legitimate penological goals, including but not limited to:

      a.      permission to purchase and wear all female clothing and property permitted by

           DOCS Directive No. 4911, and

      b.      use of feminine pronouns in addressing and referring to Plaintiff, and

      c.      authorization for and provision of Vaniqa®,  or other similar prescription facial

           hair growth inhibiting cream; and

      d.      housing in a prison housing unit that provides a safe environment for Plaintiff to

           receive the treatment and support necessary to provide constitutionally adequate

           care for her transexualism; and

4.      Declaring that Health Services Policy 1.31 is unconstitutional insofar as

       a.        it permits treatment only for gender identity disorders that have been identified

              and treated prior to incarceration; and

       b.        it categorically prohibits transexual surgical operations during incarceration; and

5.      Awarding Plaintiff damages in the amount of $150,000.00 (one hundred fifty thousand

        dollars); and

6.      Awarding Plaintiff reasonable attorneys fees; and

7.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:        January 25, 2008
             Buffalo, New York

                              /s/ Anna Marie Richmond
                     ANNA MARIE RICHMOND, ESQ.
                     Attorney for Plaintiff
                     PO Box 1215
                     Buffalo, New York  14213-7215
                     716-881-6593
                     Email:  amrichmond@verizon.net